

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

April 23, 2024

**BY ECF**

Honorable Colleen McMahon
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

   Re:  *United States v. Louis Koch*, 23 Cr. 658 (CM)

Dear Judge McMahon:

  The Government respectfully submits this letter in advance of the sentencing of Louis Koch (the "defendant"). As explained below, the Government agrees with Probation that a sentence of incarceration is not necessary or appropriate in this case, given the defendant's mitigating personal history and mental health issues. At the same time, however, the Government respectfully submits that a sentence of three years' probation—with strict conditions matching those in place under Pretrial supervision—is needed to protect ballot access for hundreds of voters across the country, and to provide relief to the defendant's former classmates whom he has harassed for years.

  **I.**  **Offense Conduct**

  As detailed in the Probation Office's Presentence Investigation Report ("PSR"), throughout the runup to the 2022 midterm elections, the defendant used more than 130 people's names, dates of birth, and other personal information—without their permission—to order their absentee ballots for midterm Congressional elections in multiple states, including New York. PSR ¶¶ 7, 9, 17. Victims included some of the defendant's old acquaintances from school, as well as an array of politicians, media personalities, and other public figures. *Id.* The defendant had all these people's ballots mailed to his own apartment in Manhattan or to a family home in New Jersey. *Id.*

  Although the defendant did not cast any of those ballots, and plainly had no intent to impact any election result, his conduct could have compromised the victims' ability to vote by absentee ballot if they had tried to do so. Under New York election rules at the time, once an absentee ballot was ordered, the Board of Elections would not issue another ballot to the same voter, meaning that the defendant's fraudulent orders would have blocked his victims from getting their own ballots by mail. *Cf. Id.* ¶ 12 (some ballots the defendant requested were not mailed to him because the actual voter had already ordered them to another address).

  Following a search of his apartment, the defendant admitted to agents that he had been

ordering ballots since 2020, *id.* ¶ 19, which is corroborated by the fact that in November 2021, law enforcement called the defendant's father to ask about the ballot of a local news anchor had been ordered to the defendant's home. After that incident, the defendant recognized that this behavior was "foolish," *id.*, but he continued doing it—and in fact significantly increased the volume of fraudulent ballot requests—until agents encountered him as part of this investigation.

After receiving notice of the charges in this case, several victims contacted this Office and spoke with prosecutors and agents. Some have known the victim since they were teenagers, and they conveyed that the defendant has harassed them for years, primarily by telephone. Specifically, some reported that the defendant has routinely used "spoofed" phone numbers (*i.e.*, services that make it appear that a caller is calling from a different phone number than his own) to call these victims and either leave cryptic messages or just breathe into the phone. Although totally unrelated to ballots, this behavior by the defendant has also been quite troubling and seems to have been a precursor to the criminal acts for which he is being sentenced.

## II. The Defendant's Deferred Prosecution Agreement and Pretrial Supervision

On or about December 16, 2022, the Honorable Magistrate Judge James L. Cott signed a deferred prosecution agreement ("DPA") that the parties had entered days earlier. Under the terms of the DPA, the Government agreed to dismiss all charges against the defendant if he abided by certain conditions for a period of three years. Although longer than the normal deferral period, the agreement was intended to ensure that the defendant would be supervised through the 2024 Presidential election.

The defendant started violating the terms of the DPA soon thereafter, and he did so routinely and in numerous ways for almost a year. For example, as confirmed through Pretrial's monitoring of his cellphone, the defendant continued to access Board of Elections websites and absentee ballots; and he continued to collect and hold personal data about other people, including the sort of information that would be needed to obtain ballots in other people's names, such as address and date of birth. Consistent with his offense conduct, the names included both political figures (a Biden administration Cabinet member and a U.S. Representative from New York) and citizens uninvolved in politics. When his phone was eventually searched in full, agents found it contained references to credit reports for two of the victims in this case, as well as pharmacy records in another person's name.[1] The defendant also continued to use spoofed phone numbers to call old acquaintances at odd hours and then either leave odd voicemails or just not speak when they answered the phone. And he sent a series of strange, hostile text messages to himself, clearly intending for this Office and/or Pretrial to read them: "Hey SDNY….I'm reading archival election material…I'm so sorry to inform you AmeriKKKan IDIOTS that once innocent civil mindedness and curiosity weren't federal crimes[.] I hate this rotten country[.] I HATE AMERIKKKAN ITALIAN CATHOLICS."

---

[1] This is reminiscent of another episode in the defendant's history: In or about 2009, he was arrested for calling in prescriptions for himself by fraudulently using physician identifiers and DEA numbers for drug providers. He was sentenced to a conditional discharge, and his conviction was later expunged.

Page 3

As the Government learned of these violations, it notified defense counsel, who has known the defendant for many years and has tried to help chart a path forward for the defendant that would have avoided a criminal conviction. The parties engaged in many good faith discussions about what, if anything, could be done to curtail the defendant's behavior. Sadly, it became apparent that nothing within the parties' or Pretrial's power could bring this matter to a satisfactory conclusion.

When a defendant violates a DPA, the Government has only three options: (1) work with Pretrial Services and defense counsel to try to bring the defendant into compliance, (2) hold the defendant in breach of the agreement and reinstate charges, or (3) dismiss the case and abandon all charges despite the defendant's failure to live up to his end of the DPA. The parties worked at option (1) for almost a year, but the defendant's violations continued. In light of his history described above, and the clear need for intervention to stop him from continuing to interfere with other people's access to their own ballots, the Government determined that dismissing the case would disserve the public interest.

In or about October 2023, the Government notified defense counsel that the DPA would be terminated, and the parties quickly arrived at the plea agreement that came before this Court late last year.

### III.   The Defendant's Plea and Applicable Guidelines Range

Pursuant to an agreement with the Government, on December 13, 2023, the defendant pled guilty to providing false information in connection with voting, in violation of 52 U.S.C. § 10307(c). PSR ¶¶ 1-2. In the plea agreement, the parties stipulated that the applicable range under the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") is 0 to 6 months' imprisonment based on an offense level of 2 and Criminal History Category of I. *Id.* ¶ 2. Probation agrees with this calculation. *Id.* ¶¶ 26-38, 72.

### IV.   Discussion

#### A. Applicable Law

Although *United States v. Booker*, 543 U.S. 220, 264 (2005), held that the Guidelines are no longer mandatory, it also held that district courts must "consult" the Guidelines and "take them into account" when sentencing. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After performing that calculation, a sentencing judge must consider seven factors outlined in 18 U.S.C. § 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant," (2) the four legitimate purposes of sentencing, as set forth below, (3) "the kinds of sentences available," (4) the Guidelines range itself, (5) any relevant policy statement by the Sentencing Commission, (6) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," and (7)

Page 4

"the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### B. Analysis

During the guilty plea in this case, the Court observed that the defendant has the lowest Guidelines offense level the Court has ever seen. The same is true for the undersigned. And at Criminal History Category I, the defendant is in the second lowest box in the entire 258-box Guidelines table. Moreover, because law enforcement fortunately intervened before the 2022 primary election, it is unlikely than any victim was *actually* harmed by the defendant's offense conduct in this case. The defendant also plainly suffers from serious mental illness that impacts his ability to function every day. Prison would not be appropriate here.

That said, something must be done to stop the defendant from interfering with old classmates' and random political and media celebrities' access to their absentee ballots. He simply cannot be allowed to continue lying to Boards of Elections or collect real ballots. His cellphone should not contain the home address and date of birth of a Biden administration Cabinet member, which could be used to order a 2024 ballot. The defendant's predilection for collecting personal identifying information and fraudulently ordering absentee ballots is a serious federal crime—one that the Government and Pretrial, through a DPA with the defendant, were not able to rein in. This Court has greater latitude to impose a multi-year term of probation with strict conditions tailored to address the unusual circumstances of this case. And the Court has far more options and enforcement authority if the defendant breaches the terms of probation.

To accomplish the goals of sentencing under 18 U.S.C. § 3553(a)—most importantly, specific deterrence and incapacitation—it is necessary for the Court to impose a lengthy term of probation under the same conditions as were applicable under the DPA, including: (1) no accessing Boards of Elections websites; (2) no contact whatsoever with, or possessing any personal information of, any identified victims; (3) routine monitoring of electronic devices by Probation, (4) readily enforceable search conditions. In addition, comprehensive mental health treatment will be critical to ensure that the defendant does not resume this same behavior in 2026, 2028, and

beyond. As part of treatment, the defendant's use of medications, alcohol, and any other substances should be also evaluated, given his history of trying heroin, abusing medication, and attempting to order his own prescriptions. *See supra* n.1; PSR ¶¶ 54-57. Finally, while the no-contact and no-personal information conditions may be difficult to enforce, Pretrial was able to detect violations of similar conditions under the DPA. Provided there is sufficient monitoring of the defendant's devices—and that Probation is empowered and directed to search those devices upon observing certain offending activities (*e.g.*, the use of "spoofing" phone services)—the Government is hopeful that a lengthy period of probation will achieve the goals of specific deterrence and incapacitation.

At bottom, it is past time for the defendant to leave his victims completely alone. His phone harassment escalated to election fraud, and all of it must be made to stop.

### V.    Conclusion

For the foregoing reasons, the Government respectfully requests that the Court impose a sentence of three years' probation with strict conditions tailored to curb the defendant's offense conduct and other harassing behaviors—and to provide for his continued, and much needed, mental health treatment.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By: _____
Frank J. Balsamello / Jonathan Rebold
Assistant United States Attorneys
(212) 637-2325 / -2512

cc:    Anthony Cariddi, Esq., *counsel for defendant Louis Koch* (by ECF)